IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
                                   )
       v.                          )          No. 3:05-CR-10
                                   )          (JORDAN/GUYTON)
CHRISTOPHER ALLEN CURRY,           )
MICHAEL VINCENT BOYD, and          )
JOVAN MENDIZABAL,                  )
                                   )
              Defendants.          )

## REPORT AND RECOMMENDATION

This case is before the Court on the defendant's Motion to Suppress Evidence [Doc. 34] and

the Defendant's Amendment to Motion to Suppress, or in the Alternative, Defendant's Motion to

Suppress on the Ground of Lack of Probable Cause to Issue Search Warrant [Doc. 36], both filed

by defendant Jovan Mendizabal ("Mendizabal"). These motions were referred to the undersigned

United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b).

An evidentiary hearing was held on June 10, 2005. Assistant United States Attorney W. Brownlow

Marsh was present representing the government. Assistant Federal Defender Jonathan Moffatt was

present representing Defendant Mendizabal. The defendant was also present.

Defendant Mendizabal has been indicted [Doc. 25] on a two-count indictment, alleging that

the defendant conspired to distribute and possess with intent to distribute cocaine from June 2004

to October 2004 and that on October 14, 2004, he possessed a firearm in furtherance of this

conspiracy. Mendizabal has moved to suppress [Docs. 34 and 36] all items of evidence stemming

1

from the October 14, 2004 search of his home, alleging that:

> (1) The search warrant was issued without sufficient probable cause
> to show that the illegal items would be located at his residence, and
>
> (2) The federal officers executing the search warrant failed to knock
> and announce their presence before forcibly entering his home.

The government responds [Doc. 38] that the search warrant affidavit contains ample probable cause to support the warrant's issuance and that the agents properly knocked and announced before entering the defendant's home.

## I. FACTS

The government's witness was Don White ("White"), an agent with the Drug Enforcement Agency ("DEA"). White testified that on October 14, 2004, he was team leader for the execution of the search warrant at Mendizabal's residence, 822 Corum Road, Knoxville, Tennessee. White explained that the entry team was comprised of four persons and that two other persons were stationed at the back of the residence. White testified that the two persons in the back did not enter the residence.

White testified that a confidential informant had reported that there were weapons in the house. White said that as his entry team prepared to enter the house, he observed a couple of vehicles in the driveway. The time of day was mid-afternoon. White testified that the entry team prepared to enter in a stacked formation through the front door of the residence, with himself in the front of the team. White said that he knocked three times at the front door, announced who they were, and waited approximately ten seconds. He said there was no response from inside the house.

2

White testified that based on considerations of officer safety, the entry team, after waiting approximately ten seconds, hit the front door with a ram. However, White said the door would flex but would not open, even after the entry team struck it five times with the ram. Finally, according to White, a panel on the side of the front door popped out, and he was able to reach in and unlock the door. White estimated that the total time that elapsed while gaining entry was forty-five seconds to a minute.

White described Mendizabal's residence as a "split foyer" design. He said that while going in, the team members yelled, "Federal search warrant," "Show your hands," and "Get on the floor." After gaining access, the entry team members split up and cleared rooms. White testified that during the process of clearing rooms, Agent Mike Davis, a team member, found two people in a bedroom. The entry team found no other people in the house.

On cross-examination, White testified that he believed the residence at 822 Corum was owned by Mendizabal. White testified that the search warrant was supported by information from a confidential source ("CS"). He said that the CS had a history with White, that the CS had been inside 822 Corum, and that the CS said other persons lived in the residence with Mendizabal.

White also testified that on the day the search warrant was executed, another DEA operation took place at Knoxville Center Mall. This operation involved a controlled buy and the defendant. The operation was being conducted by DEA Agent Mike Long ("Long"). White said that his entry team waited for a call from Long telling them that Long had Mendizabal in custody before the search warrant was executed. Therefore, White testified, he knew Mendizabal was in custody, and not in the residence, before the entry team gained access to the house.

White testified that before entry, he banged on the door with his fist three times but received

no response.  He said he announced, "Federal search warrant; open the door."  White testified that

the bedroom in which two persons were found was the bedroom closest to the front door.  When

White first saw the persons in the bedroom, a male was on the floor, having been ordered there by

the officer, and a female was in the bed.

The defendant's witness was Mussa Nuri ("Nuri").  Nuri testified that he was living

at 822 Corum in October 2004, and that he paid rent to live there.  He testified that his bedroom was

located above the front door entrance and was the first door on the right at the top of the stairs.

Nuri testified that on the afternoon of October 14, 2004, he was in the bed with his girlfriend.

He said he was not aware of the law enforcement officers until they were inside of the house.  Nuri

testified that the first sounds he heard were three loud bangs.  He said it sounded like hammers

hitting the front door.  He did not react to the three bangs.  He said he did not hear officers outside

of the house.

Nuri testified that an agent came into his room and dragged him out of bed.  Nuri said that

he was awake, lying in bed, talking with his girlfriend, and not watching television or listening to

music.  Nuri testified that he heard shouts of "DEA" after the officers entered the house.  Nuri

testified that after the officers left, he saw a big hole in the front door.  He said it seemed as though

it had been battered down.

On cross-examination, Nuri testified that it was possible he did not hear knocks on

the front door.  He said that after he heard the third bang sound, an agent was in his room less than

ten seconds later.

## II.  ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures.  In this respect, a judge shall not issue a warrant for the search of a home or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The defendant contends that his rights under the Fourth Amendment were violated because the instant search warrant lacks probable cause establishing that the alleged illegal items would be at his residence.  The defendant also faults the execution of the search warrant, arguing that the agents failed to knock and announce their presence before forcibly entering his home.  The Court will examine each of these contentions in turn.

### A.  Probable Cause to Search

The defendant contends [Doc. 36] that the search warrant affidavit does not provide a nexus between the place to be searched–his home–and the evidence sought–evidence of the distribution of cocaine.   He maintains that the affidavit does not indicate that any criminal activity occurred at his house.  Also, he argues that the <u>Leon</u> good-faith exception does not save the present search warrant because the affidavit is so lacking in probable cause as to be essentially a "bare bones" affidavit.  Accordingly, he asserts that no reasonable officer could have relied upon the affidavit and search warrant in good faith.

The government responds [Doc. 38] that the affidavit contains ample probable cause to sustain the search warrant.  It notes that the affiant stated that based upon his training and experience, drug traffickers commonly maintain books, records, notes, ledgers, and other papers

5

relating to the distribution of controlled substances, as well as the controlled substances themselves, in their homes. Also, the government points out that the affidavit relates that a confidential informant had purchased cocaine from the defendant on a weekly basis and had met with the defendant at his home to arrange future cocaine transactions. The affidavit also states that the affiant had corroborated the informant. Thus, the government argues that the affidavit provides a connection between the defendant's house and the items being sought.

Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make such a showing "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 244 n.13. Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162 . . . (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. Brinegar v. United States, 338 U.S. 160, 176 . . . (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

Initially, the Court would note that the issuing judge's determination that probable cause exists is entitled to "'great deference.'" United States v. Allen, 211 F.3d 970, 973 (6th Cir.

2000) (quoting Gates, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. Id. In determining the sufficiency of the search warrant affidavit, the Court is "concerned only with the statements of fact contained in the affidavit." United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971). In reviewing the propriety of the search warrant, the Court considers "the evidence that the issuing magistrate had before him only 'to ensure that [he] ha[d] a substantial basis . . . for concluding that probable cause existed.'" United States v. Jones, 159 F.3d 969, 973 (6th Cir. 1998) (quoting Gates, 462 U.S. at 238-39) (alterations in original).

In the present case, the Application and Affidavit for Search Warrant states that the applicant seeks to search 822 Corum Road, Knoxville, Tennessee, for "Evidence of Criminal Activity; fruits of a crime; or other items illegally possessed; property designed or intended for use or used in committing a crime."[1] The affidavit, which is six pages long excluding attachments, first relates the training and seventeen years of experience of the affiant, DEA Task Force Agent Mike Long. Long states that based upon his training and experience, he knows

> [t]hat drug traffickers maintain books, records, receipts, notes,
> ledgers, and other papers relating to the transportation, ordering,
> sale, and distribution of controlled substances, even though such
> documents may be in code. That drug traffickers commonly
> "front" drugs to their clients. That the aforementioned books,
> records, receipts, notes, ledgers, etc. are commonly maintained
> where the drug traffickers have ready access to them, i.e., homes,
> offices, personal computers, automobiles, storage buildings, and
> safe deposit boxes[.]

Long also notes that large-scale drug dealers often conceal contraband, drug proceeds, and

---

[1]The Court notes that all but the first phrase is handwritten on the application.

7

records in secure locations within their homes as well as in other secure locations.

The affidavit states that on September 14, 2004, a confidential source told Long that he had been trafficking in cocaine for six months after he was introduced to the defendant and that he had purchased cocaine on a weekly basis from the defendant. The informant subsequently met with the defendant and then told Long that during the meeting, the defendant said he had fronted cocaine to a person who now owed him a large amount of money. The informant also stated that the defendant said that he was presently owed about $20,000 from people for the sale of cocaine.

The affidavit states that on October 1, 2004, the informant went to the defendant's home to arrange a future cocaine purchase. The informant was wearing a recording device, and Long overheard the defendant talking "about his cocaine business and about fronting an individual multi ounces of cocaine and also about this individual owing him (MENDIZABAL) $6,000.00 from previously [sic] cocaine sells [sic]. MENDIZABAL was also overheard by agent's [sic] saying he had made enough money from drug sales to retire." The affidavit states that on October 5, 2004, the informant participated in a controlled purchase of cocaine from the defendant in the parking lot of a Chili's restaurant.

Finally, the affidavit and Attachment B lists the types of items that the affiant would expect to find at the defendant's residence. These items include paperwork relating to the transportation, ordering, purchase, and distribution of cocaine; paraphernalia used in the packaging, cutting, weighing, manufacturing, and distribution of cocaine; financial records; records of names, telephone numbers, drug quantities, and monies paid; and firearms.

"To justify a search, the circumstances must indicate why evidence of illegal activity will

be found 'in a particular place.'" United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). In other words, the Fourth Amendment requires a "'nexus between the place to be searched and the evidence sought.'" Id. (quoting United States v. Van Shutters, 163 F.3d 331, 336-37 (6th Cir. 1998)).

In the present case, the Court finds that the affidavit provides a substantial basis for the magistrate judge's conclusion that probable cause existed to issue the warrant. First, the affidavit states that Long's training and experience indicate that drug traffickers keep various records relating to their drug business in their homes. Also, based upon his training and experience, Long knows that drug dealers commonly front drugs to their clients. As the government points out, an officer's beliefs, based upon his training and experience, are properly part of the totality of the circumstances, which are considered in the probable cause determination. See United States v. Scotts, 176 F.3d 880, 885 (6th Cir. 1999), cert. denied, 528 U.S. 1127 (2000); c.f. United States v. Schultz, 14 F.3d 1093, 1097 (6th Cir. 1994) (observing that an officer's assertions based upon his training and experience, while relevant, cannot be the sole basis for a nexus between the criminal activity and the place to be searched). "A judicial officer may rely on an experienced officer's conclusions based on the nature of the evidence and type of offense." Scotts, 176 F.3d at 885 (affirming the magistrate judge's reliance on the affiant's assessment of the facts reported by another source). In the present case, the confidential informant's conversations with the defendant revealed that the defendant both fronted drugs to multiple people and was owed large sums of money for drug transactions. The fact that there were multiple people and large sums of money involved suggests that the defendant likely kept records of who and how much. Long's training and experience caused him to believe that the

9

defendant would keep these records in his home.

The Court finds that the confidential informant's meeting with the defendant at his home on October 1, 2004, is another circumstance supporting probable cause that evidence of criminal activity would be found at the defendant's home. A probable cause determination may be supported by information obtained from a confidential informant substantiated by independent corroboration by law enforcement. Jones, 159 F.3d at 974. Police do not necessarily have to corroborate the criminal conduct observed by the informant; instead, corroboration of unincriminating facts can be sufficient to establish probable cause. Gates, 462 U.S. at 243-44. "It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Id. at 244-45 (quoting Jones v. United States, 362 U.S. 257, 269, 271 (1960)).

In the present case, the confidential source told task force agents that he had been trafficking in cocaine for six months after being introduced to the defendant. The informant stated that he purchased cocaine from the defendant weekly. The affiant corroborated the informant's dealings with the defendant by listening to a recorded telephone call and a meeting between the informant and the defendant, in which the defendant discussed his drug business. The meeting, which the affiant overheard, was conducted at the defendant's home. The purpose of this meeting was to arrange a future cocaine purchase. During the meeting at his home, the defendant discussed fronting someone multiple ounces of cocaine. The defendant said this person owed him $6,000 from previous cocaine sales. The defendant also stated that he had made enough money from drug sales to retire. Thus, the affidavit shows that the defendant

10

conducted at least the organizational aspect of his cocaine business at his home in that he met

with the informant at his home to arrange a future cocaine purchase. Additionally, the

defendant's discussion of fronting cocaine and being owed large drug debts lends additional

significance to Long's belief, based upon his training and experience, that drug traffickers store

records of their drug business in their home. As discussed above, the Court infers that the

defendant would need to keep records of the cocaine he had fronted and the money he was owed

for cocaine. Thus, Long's beliefs based upon his training and experience combined with the

information from the confidential source and the meeting at the defendant's home provide the

nexus between the defendant's cocaine business and his home.

The defendant argues that the affidavit does not state that a drug deal had ever occurred

at the defendant's home. Instead, he contends that the drug deal described in the affidavit is

alleged to have occurred at a restaurant and not at the defendant's home. The Sixth Circuit has

affirmed the search of a defendant's residence, despite the fact that no drug deals took place at

the residence, when other evidence linked the residence with drug activity at other locations.

See United States v. Miggins, 302 F.3d 384, 393 (6th Cir. 2002), cert. denied, 537 U.S. 1130

(2003). Defendant Miggins was arrested after accepting delivery at his codefendant Moore's

house of a package containing cocaine. Id. Miggins had a piece of paper in his pocket listing

Moore's address and three names–the assumed name he had used to sign for the package, the

name of the package's sender, and the name of the package's recipient. Id. Police also knew

that Miggins and another codefendant lived together in an apartment and were both involved in

drug trafficking. Id. The court found that this information, which was contained in the search

warrant affidavit, provided a sufficient nexus between Moore's house and Miggins' apartment to

provide probable cause for the search of Miggins' apartment.  Id.

In the present case, the Court finds that the nexus is more substantial than that in Miggins. Here, the evidence of a nexus goes beyond the facts that the defendant was a drug trafficker and that he lived at the address in question.  Instead, the affidavit shows that the defendant used his home to conduct a meeting related to his drug business.  Accordingly, the Court finds the  affidavit's failure to state that drug deals took place at the defendant's home is not fatal to a probable cause finding.

Moreover, the fact that the meeting at the defendant's home occurred some twelve days before the search warrant was issued is likewise unavailing.  The information in the affidavit showed that the defendant was involved in ongoing drug business, with the most recent drug deal mentioned in the affidavit occurring seven days before the warrant's issuance.  The question of staleness of information in a search warrant affidavit is not linked to some arbitrary time limit but, instead, is based upon the nature of the crime:  (1) whether the crime is a single event or of recurring nature, (2) whether the item to be seized is easily used or transferred or is enduring; and (3) whether the place to be searched is a temporary or one-time forum or a more permanent base of operations.  United States v. Spikes, 158 F.3d 913, 923 (6th Cir. 1998), cert. denied, 525 U.S. 1086 (1999).  In the present case, given that the defendant's drug enterprise is alleged to have spanned at least six months, that the records of drug trafficking would likely be kept for a long period of time, and that the place to be searched is the defendant's home, the Court finds that the information in the affidavit is not stale.

Accordingly, the Court finds that the affidavit contains probable cause to justify the issuance of the search warrant for the defendant's home.  Thus, the Court recommends that the

District Court deny the defendant's amended suppression motion [Doc. 36]. In the event that the District Court disagrees with this finding, the Court will briefly analyze the defendant's contention that the evidence stemming from the search cannot be saved by the good faith exception.

In United States v. Leon, 468 U.S. 897, 920 (1984), the Supreme Court recognized that the deterrent effect of the judicially created exclusionary rule did not extend to situations in which an officer in objective good faith obtains a search warrant from a judge and acts within the scope of that warrant. "In the ordinary case, an officer cannot be expected to question the [judge's] probable-cause determination or his judgment that the form of a warrant is technically sufficient. . . . . Penalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. at 921.

The fact that a judge has issued a warrant typically will establish that the officer has conducted the search pursuant to said warrant in good faith, but the officer's reliance upon the warrant must be objectively reasonable. Id. at 922. In other words, the good-faith inquiry turns upon "whether a reasonably well-trained officer would have known that the search was illegal despite the [judge's] authorization." Id. at 922 n.23. In creating this standard, the Supreme Court set out four situations in which suppression pursuant to the exclusionary rule applied despite the officer's reliance upon a judicially-issued search warrant: (1) "if the . . . judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," (2) if the issuing judge "wholly abandoned his judicial role" requiring neutral detachment and, in essence, acted as "'an adjunct law enforcement officer,'" (3) if the "warrant [was] based on an affidavit 'so

13

lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and (4) if "the warrant [is] so facially deficient–i.e., in failing to particularize the place to be searched or the things to be seized–that the executing officers cannot reasonably presume it to be valid." Id. at 923 (quoting Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326-27 (1979) and Brown v. Illinois, 422 U.S. 590, 610-11 (1975) respectively). The present defendant argues that the third situation applies in this case. He asserts that the search warrant affidavit is so lacking in probable cause that it is essentially a "bare bones" affidavit and that Long could not reasonably rely upon it.

In the present case, Long did not present the issuing judge with a bare bones affidavit. The Sixth Circuit has defined a bare bones affidavit as a "conclusory affidavit," which gives only the affiant's belief of the existence of probable cause. United States v. Williams, 224 F.3d 530, 533 (6th Cir. 2000); see also United States v. Weaver, 99 F.3d 1372, 1378 (6th Cir. 1996) (observing that a bare bones affidavit is one that "states suspicious beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge"). The affidavit in this case contains facts, not just the affiant's conclusions or beliefs. The affiant relates the information that he received from the confidential source as well as information from recorded conversations that he personally overheard. Thus, the Court finds that a reasonably well-trained officer would have relied upon the issuing judge's determination that the affidavit provides probable cause to search the defendant's residence.

At the suppression hearing, the defendant compared this case to United States v. Laughton, 409 F.3d 744 (6th Cir. 2005), in which the court rejected the application of the good faith exception. In Laughton, the affidavit related the officer's training and experience and the

fact that he was involved in ongoing drug investigations and was assisted by a reliable informant. Id. at 746-47.  The affidavit related that the affiant had learned that the defendant kept controlled substances on his person and that "there are various stashes around the home."  Id. at 747.  The affidavit also stated that the informant had seen controlled substances in "the residence" or on the defendant's person.  Id.  The affidavit did not link the home or residence with the defendant, and the government conceded that the affidavit was insufficient in showing probable cause.  Id. at 748.  In holding that the good faith exception did not apply, the court pointed out that the affidavit did not state that the informant had purchased drugs from the defendant and did not identify the location of the residence where the informant had seen controlled substances nor when the informant made this observation.  Id. at 751.  The court noted that, instead, the affidavit gave the address to be searched, a list of the affiant's experience, and "two acontextual allegations against" the defendant.  Id.  As such, the court found that "[n]o reasonable officer could have believed that the affidavit was not so lacking in indicia of probable cause as to be reliable."  Id.

The defendant argues that, like the affidavit in Laughlin, the present affidavit contains no supporting facts but just the beliefs and conclusions of Long.  To the contrary, the Court finds that the affidavit contains facts about the defendant's drug trafficking that are set within the context of the informant's conversations and transactions with the defendant.  Thus, the present affidavit is neither conclusory or acontextual.  The Court finds that Long reasonably relied upon the search warrant.  Accordingly, if the District Court determines that the affidavit contains an insufficient nexus between the defendant's house and the evidence of cocaine trafficking sought, then the Court continues to recommend that the amended suppression motion be denied based

upon the applicability of the <u>Leon</u> good faith exception.

## B. Knock and Announce

The defendant contends [Doc. 34] that the evidence stemming from the execution of the search warrant should be suppressed because the agents failed to knock and announce their presence before forcibly entering his home. The defendant also argues that the agents failed to wait a reasonable amount of time after knocking before they entered. At the suppression hearing, the defendant argued that Nuri, the defendant's tenant, was in his bedroom just above the entry and was surprised by three loud bangs, which the defendant contends were from the battering ram. He emphasizes that Nuri heard no announcement from the agents until they were inside the house.

The government responds [Doc. 38] that when executing a search warrant for drugs, officers need only wait a few seconds after knocking and announcing before forcing entry due to the speed and ease with which drugs can be destroyed. Additionally, it contends that because the officers suspected that firearms were in the house, they could permissibly enter even sooner in order to prevent the occupants from arming themselves. The government asserts that the officers knocked and announced twice, before forcing entry and that the whole process took about sixty seconds.

"Absent exigent circumstances, the Fourth Amendment requires the police to knock and announce their presence before forcibly entering a location to execute a search warrant." <u>United States v. Pelayo-Landero</u>, 285 F.3d 491, 498 (6th Cir. 2002). The principle that officers must identify themselves and their purpose (i.e., knock and announce) is codified at 18 U.S.C. § 3109:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after

16

> notice of his authority and purpose, he is refused admittance or when necessary to
> liberate himself or a person aiding him in the execution of the warrant.

The Supreme Court has held that this principle is part of the inquiry regarding whether a search

is reasonable under the Fourth Amendment.  Wilson v. Arkansas, 514 U.S. 927, 929 (1995); see

also United States v. Finch, 998 F.2d 349, 353 (6th Cir. 1993) (holding that the knock and

announce rule applies without regard to whether the warrant is executed by state or federal

officers).  "At its core, the 'knock and announce' rule serves to respect the sanctity of a person's

home by affording notice to those inside so that they may open the door peaceably and without

the needless destruction of property, as well as by avoiding the possibility of a violent

confrontation if those inside mistook the police for intruders."  United States v. Spikes, 158 F.3d

913, 925 (6th Cir. 1998), cert. denied, 525 U.S. 1086 (1999).

Fulfillment of the knock and announce rule is triggered not by the officer's use of any

particular word but "when those inside should have been alerted that the police wanted entry to

execute a warrant."  Spikes, 158 F.3d at 925 (observing that the occupants should have been

alerted to the officers' presence and purpose by the officers' announcement of same on a

bullhorn fifteen to thirty seconds before entry rather than their knock four seconds before entry).

Once the officer knocks, he or she must wait a reasonable length of time before forcing entry in

order to allow the occupant an opportunity to admit him or her.   United States v. Dice, 200 F.3d

978, 983 (6th Cir. 2000).  The Sixth Circuit has rejected establishing a bright line rule for how

long officers must wait after knocking before they force entry.  Spikes, 158 F.3d at 926.

Whether an officer has waited long enough is determined by considering the surrounding

circumstances on a case-by-case basis.  Id. (holding that officers searching for drugs were

justified in forcing entry fifteen to thirty seconds after announcing in situation where they knew

the occupants were armed).

Based upon Agent White's testimony, the Court finds that the agents executed the search warrant in the mid-afternoon and noticed a couple of cars in the driveway. Additionally, they had information from a confidential informant that there were weapons inside the house. The agents knocked three times on the front door, announced who they were, and waited approximately ten seconds. Upon hearing no response from within the house, the officers proceeded to attempt to gain entry with a battering ram. The entry team struck the door five times with the ram, and the door flexed but did not break. Finally, a panel on the door popped out, and White reached through the opening and unlocked the door. The entire entry process took forty-five seconds to one minute. As they entered the house, the entry team yelled "Federal search warrant," "Show your hands," and "Get on the floor."

The defendant challenges White's testimony about the entry procedure by pointing to Nuri's testimony that he only heard three loud bangs before hearing the officers inside the house. He said that after the third bang, an officer was in his bedroom in less than ten seconds. The Court notes that Nuri stated that he did not respond to the three loud bangs and that it was possible that the officers knocked without him hearing them. The Court credits Agent White's testimony on this issue, finding that the agents did knock, announce, and wait ten seconds before beginning to force entry. Given the thickness of the door, which could not be battered down, and that Nuri was engaged in talking with his girlfriend, the Court finds it more plausible that Nuri did not hear the officers knocking and announcing.

The defendant also faults the officers for failing to wait a reasonable length of time before forcing entry. The Court finds that the officers waited ten seconds after knocking and

18

announcing before beginning to batter the door. The Supreme Court has held that a fifteen-to-twenty-second wait before forcing entry in a cocaine distribution case was reasonable. United States v. Banks, 540 U.S. 31, 40 (2003). In Banks, the Court observed that in addition to the ease with which cocaine can be disposed, the officers executed the warrant during the day, "when anyone inside would have probably been up and around," and that fifteen to twenty seconds was enough time for an occupant to get to the "bathroom or kitchen to start flushing cocaine down the drain." Id. Thus, the Court concluded that the danger that the evidence would be lost justified the forced entry after fifteen to twenty seconds. Id.

Likewise, in United States v. Pennington, 328 F.3d 215 (6th Cir. 2003), officers waited eight to ten seconds after knocking and announcing before forcing entry to execute a search warrant for drugs and other items. The Sixth Circuit determined that given the circumstances of the situation, eight to ten seconds was a reasonable period of time to wait. Id. at 221. In so holding, the court observed that the officers were searching for drugs, which could be quickly and easily destroyed. Id. It also noted that the warrant was executed in mid-afternoon, a time at which people are likely to be awake. Id. The Court contrast this timing with execution of a warrant in the dead of night, when it would take occupants longer to open the door and which would increase the length of time the officers should wait. Id. (citing Spikes, 158 F.3d at 927). Finally, the court relied upon the fact that the officers heard the sound of footsteps, indicating that someone running away from the door. Id.

In the present case, the agents were searching for drugs as well as documentation of the defendant's drug business. The warrant was also executed in the mid-afternoon when persons are likely to be awake. Although the agents did not hear or observe anything that would cause

them to think the occupants of the house were aware of their presence and attempting to destroy the drugs, the officers did believe the house was occupied (by persons other than the defendant), due to the presence of two vehicles in the driveway.

Moreover, in this case, the agents had information that there were firearms inside the residence. Even in the absence of exigent circumstances, the Sixth Circuit has recognized that danger to the officers from armed occupants can justify a short pause before forcing entry: "'Once police officers seeking to enter a drug trafficker's enclave have announced their identity and authority, they stand before the door blind and vulnerable. In such a danger-fraught situation, the officers may quite reasonably infer refusal more readily than under other circumstances.'" Spikes, 158 F.3d at 926-27 (quoting United States v. Bonner, 874 F.2d 822, 824 (D.C. Cir. 1989)). The Court finds that due to the timing of the execution (mid-afternoon), the ready destructibility of the contraband sought (drugs), the evidence that the house was occupied, and the information that there were firearms inside the house, the ten second wait in this case was reasonable. See also United States v. McCraven, 401 F.3d 693, 699 (6th Cir. 2005) (affirming forced entry in daytime execution of search warrant for drugs after ten to twelve second wait). Accordingly, the Court finds no constitutional violation in the execution of the present search warrant and recommends that the defendant's suppression motion be denied.

20

## III. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to
Suppress Evidence [**Doc. 34**] and the Defendant's Amendment to Motion to Suppress, or in the
Alternative, Defendant's Motion to Suppress on the Ground of Lack of Probable Cause to Issue
Search Warrant [**Doc. 36**] be **DENIED**.[2]

Respectfully submitted,


_____ s/ H. Bruce Guyton _____
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be served and filed within ten
(10) days after service of a copy of this recommended disposition on the objecting party.  Failure
to file objections within the time specified waives the right to appeal the District Court's order.
Thomas v. Arn, 474 U.S. 140 (1985).  The District Court need not provide de novo review where
objections to this report and recommendation are frivolous, conclusive, or general.  Mira v.
Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate
review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

21